NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| Morris J. WASHINGTON, M.D.,<br><br>    Plaintiff,<br><br>v.<br><br>CENTRASTATE HEALTHCARE SYSTEMS, INC.; John GRIBBIN; Daniel MESSINA; Kim KELLY; RICH MACKESY; and John DOES 1–38,<br><br>    Defendants. | Civ. No. 10-6279<br><br>OPINION & ORDER |

THOMPSON, U.S.D.J.

## I.  INTRODUCTION

This matter comes before the Court upon the Motion to Dismiss [docket # 6] filed by Defendants CentraState Healthcare Systems, Inc., John Gribbin, Daniel Messina, Kim Kelly, and Rich Mackesy (collectively, "Defendants").  Plaintiff Morris J. Washington, M.D., opposes the motion [9].  The Court has decided the matter upon consideration of the parties' written submissions and without oral argument, pursuant to Fed. R. Civ. P. 78(b).  For the reasons given below, Defendants' Motion to Dismiss is denied.

## II.  BACKGROUND[1]

Plaintiff Washington is an African-American surgeon who alleges that he was discriminated against by CentraState Healthcare Systems, Inc., ("the Hospital") and key hospital personnel because of his race and in retaliation for complaints he made about inappropriate

---
[1] The following facts are taken from Plaintiff's Complaint.

1

behavior by hospital employees. He brings his discrimination and retaliation claims under 42 U.S.C. § 1981 and the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1, *et seq.*, and he also alleges that Defendants engaged in a civil conspiracy and slander *per se* in violation of New Jersey state law. Defendants now move to dismiss the case and compel Plaintiff to participate in mediation and arbitration, which they believe is required by the parties' contractual agreements.

Plaintiff is an accomplished doctor who has provided surgery services to the Hospital since 2002. (Compl. ¶ 14) [1]. In 2006, Plaintiff—on behalf of Endo-Surgical Associates of Central New Jersey, LLC ("Endo-Surgical"), a company wholly-owned by Plaintiff—contracted with the Hospital to provide bariatric medical services.[2] (*Id*. at ¶¶ 20–21.) Under the parties' contract, the Bariatric Services Agreement ("BSA"), Plaintiff would serve as the Medical Director for the Hospital's Bariatric Program from July 2006 to June 2009, and Plaintiff's company, Endo-Surgical, would provide bariatric management and consulting services from March 2006 to February 2010. (*Id*. at ¶ 22.) The contract expressly states that it does not create an employer–employee relationship. (Aff. of Vincent Cino, Esq., Ex. A, Services Agreement 5–6) [6-2]. The BSA also contains a "Mediation and Arbitration" clause that provides:

> The parties agree to attempt to resolve any disputes under this Agreement in good faith through mediation. . . . Any controversy or claim arising out of or relating to this Agreement or the breach thereof which cannot be resolved or concluded in a timely fashion by mediation, shall be settled by arbitration . . . .

(*Id*. 6.)

Plaintiff alleges that he has been the target of harassment ever since he became affiliated with the Hospital in 2002. For instance, Hospital employees or affiliates discouraged new surgeons from joining Plaintiff's practice, made false accusations about his treatment of patients, and subjected his colleagues to unreasonable oversight. (Compl. at ¶ 32.) Plaintiff also asserts

---

[2] "Bariatric" medical services are those provided to the obese. (Compl. ¶ 22.)

that the Hospital has tolerated inappropriate behavior by its employees. In particular, Plaintiff alleges that the Chief of Surgery, Dr. Charles Dinerstein, has often made derogatory sexual and racial comments. (*See id*. at ¶¶ 40–43.) In 2006, Plaintiff and three other African-American professionals were performing surgery when Dr. Dinerstein entered the operating room and quipped that he now understood "what it's like to operate in the 'hood.'" (*Id*. at ¶ 48.) In April 2008, during a departmental meeting about upcoming diversity training, Dr. Dinerstein offered that the purpose of the training was so the staff could "learn the ways of the gentiles." (*Id*. at ¶ 49.) Another doctor joked that the staff would "have to listen to Arab music." (*Id*.) Plaintiff complained about Dr. Dinerstein to Defendant John Gribbin, the Hospital's Chief Executive Officer, and was told, "[T]hat's just Chuck," and that next time Plaintiff should respond by saying "something clever back about the Jews." (*Id*. at ¶ 51.) Plaintiff followed up by sending a letter to the Hospital's Chief of Staff detailing the various inappropriate incidents; he received no response. (*Id*. at ¶¶ 56–57.) After writing a second letter, Plaintiff was told that his complaints would be investigated, but Plaintiff does not believe any action was ever taken. (*Id*. at ¶¶ 58–60.)

  Plaintiff believes that his complaints caused him to become the subject of a campaign of retaliatory harassment by Hospital personnel. The key instances are as follows: (1) the Hospital refused to renew Plaintiff's directorship of the Bariatric Program and replaced him with a less-qualified doctor for no rational reason; (2) the Hospital breached the terms of the BSA; (3) the Hospital refused to renew the BSA for no rational reason; and (4) Plaintiff was personally harassed, marginalized, and discriminated against by Hospital personnel. (*Id*. at ¶ 61).

  In February 2009, Plaintiff was told that the Hospital would not be renewing his directorship of the Bariatric Program once the BSA expired in June 2009. (*Id*. ¶ 62.) When Plaintiff asked why, Hospital personnel told him it was because he had begun providing bariatric

3

services at another hospital, Bayshore, in July 2008.  (*Id*. at ¶ 72.)  Plaintiff states that he spoke with Defendant Daniel Messina when he first began his relationship with Bayshore Hospital and told Messina that the reason he was branching out was the ongoing harassment at CentraState Hospital.  (*Id*. at ¶ 74.)  Messina responded that Plaintiff would "regret" this "bad decision." (*Id*.)  However, Plaintiff maintains that the BSA did not forbid his work at Bayshore and that it is common practice for other CentraState physicians to provide services at other hospitals.  (*Id*. at ¶¶ 75–76.)  Plaintiff later offered to quit working at Bayshore if the Hospital would renew the BSA; the Hospital refused but offered no explanation.  (*Id*. at ¶¶ 79–80.)

In addition to the Hospital's refusal to renew the BSA, Plaintiff also details numerous instances of alleged harassment after he began providing services at Bayshore, including the following: he was denied the use of a conference room to conduct a routine seminar, (*id*. at ¶ 81); his name was excluded from a weight-loss fair hosted by the Hospital, (*id*. at ¶ 82); his picture was removed from a wall featuring members of the Hospital's advisory board, (*id*. at ¶ 83); he was not named a co-applicant on the Hospital's application to certify its bariatric program as a surgery "Center of Excellence" even though the application cited statistics from Plaintiff's surgeries, (*id*. at ¶ 84); the Hospital terminated one of Plaintiff's assistants but failed to allege poor performance as required by the BSA, (*id*. at ¶ 85); prospective patients were told that Plaintiff was no longer affiliated with the Hospital, (*id*. at ¶ 86); Plaintiff was forced to pay for training that was provided free to other Hospital surgeons, (*id*. at ¶¶ 89–94); the Hospital stopped referring bariatric patients from the Hospital's service line to Plaintiff, (*id*. at ¶¶ 97–98); Plaintiff was not invited to a bariatric symposium, (*id*. at ¶ 100); he stopped receiving survey questionnaires on the Hospital's mortality performance, (*id*. at ¶¶ 102–103); his authorization to perform bariatric surgeries on adolescents was revoked, (*id*. at ¶¶ 104–105); and the Hospital

refused to consent to the assignment of his business, Endo-Surgical, to a third-party, (*id*. at ¶ 107).

In late July 2010, Plaintiff filed employment discrimination charges with the U.S. Equal Employment Opportunity Commission (EEOC) and the New Jersey Division on Civil Rights (NJDCR) alleging employment discrimination.  Plaintiff subsequently dropped the NJDCR charges; the EEOC is currently investigating Plaintiff's claims.  (*Id*. ¶ 13.)

On December 3, 2010, Plaintiff filed the Complaint in this Court.  Defendants now move to dismiss and compel Plaintiff to participate in mediation and arbitration.  They argue that the BSA's mediation and arbitration clause is valid and enforceable under the Federal Arbitration Act and a similar New Jersey statue, and they further argue that Plaintiff's claims in this lawsuit fall within the scope of the BSA's clause.  Plaintiff opposes the motion, arguing that the parties did not intend the clause to cover his statutory rights claims.

### III. ANALYSIS

#### A.  Legal Standard

Defendants move to dismiss the Complaint and compel mediation and arbitration pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, *et seq.*, and the New Jersey Uniform Arbitration Act of 2003 ("NJUAA"), N.J.S.A. 2A:23B-1, *et seq*.  However, neither the FAA nor the NJUAA permits dismissal of an arbitrable case; rather, only a stay may be issued pending arbitration.  The New Jersey Supreme Court has stated that the NJUAA "only provides for stays, rather than dismissals, of actions pending arbitration."  *GMAC v. Pittella*, --- A.3d ----, 2011 WL 1004698, at *7 n.6 (N.J. Mar. 23, 2011) (citing N.J.S.A. 2A:23B-7(g) ("If the court orders arbitration, the court on just terms shall *stay* any judicial proceeding that involves a claim subject to the arbitration.") (emphasis added)).  Similarly, the Third Circuit Court of Appeals has

held that "the plain language of [FAA] § 3 affords a district court no discretion to dismiss . . . ." *Lloyd v. HOVENSA, LLC*, 369 F.3d 263, 269 (3d Cir. 2004); *see also Nino v. Jewelry Exchange, Inc.*, 609 F.3d 191, 208 n.7 (3d Cir. 2010) (relying on *Lloyd* in declaring that district court should have issued stay even though party sought dismissal); *Griffen v. Alpha Phi Alpha*, Civ. No. 06-1735, 2007 WL 707364, at *9 n. 14 (E.D. Pa. March 2, 2007) (relying on *Lloyd* for decision to stay rather than dismiss proceedings). *But see Next Step Med. Co. v. Johnson & Johnson Int'l*, 619 F.3d 67, 71 (1st Cir. 2010) ("[I]n this circuit a district court can, in its discretion, choose to dismiss the law suit, if all claims asserted in the case are found arbitrable.") (citations omitted)).

Accordingly, we will treat Defendants' motion as a motion to stay the proceedings in favor of arbitration. A motion to stay is treated as a motion for summary judgment because the Court must decide the question of whether the parties have agreed to submit the particular dispute to arbitration. *Par-Knit Mills, Inc. v. Stockbridge Fabrics Co.*, 636 F.2d 51, 54 & n.9 (3d Cir. 1980); *Nova Corp. v. Joseph Stadelmann Elec., Contractors, Inc.*, Civ. No. 07-1104, 2008 WL 746672, at *2 (D.N.J. Mar. 18, 2008). We must therefore "view the inferences to be drawn from the underlying facts in the light most favorable to" Plaintiff as the party opposing the motion and determine whether there is a "genuine issue as to any material fact" or whether Defendants are "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Curley v. Klem*, 298 F.3d 271, 276–77 (3d Cir. 2002).

### B. The FAA and NJUAA Framework

The parties' arbitration agreement is governed by the FAA and NJUAA. Section 2 of the FAA provides: "A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. This provision evinces "the fundamental principle

that arbitration is a matter of contract," and "requires courts to enforce [arbitration agreements] according to their terms." *Rent-A-Center, West, Inc. v. Jackson*, --- U.S. ----, 130 S.Ct. 2772, 2776 (2010) (citations omitted). To implement § 2's substantive rule, "a party may apply to a federal court for a stay of the trial of an action 'upon any issue referable to arbitration under an agreement in writing for such arbitration.'" *Id*. (quoting 9 U.S.C. § 3). Also, the court may, on application from a party "aggrieved" by another party's failure to arbitrate under an agreement, compel "the parties to proceed to arbitration in accordance with the terms of the agreement." 9 U.S.C. § 4. The NJUAA has a substantive provision nearly identical to the FAA's § 2, *see* N.J.S.A. 2A:23B-6(a), and a mechanism for staying court proceedings and compelling arbitration similar to the FAA's §§ 3 and 4, *see* N.J.S.A. 2A:23B-7. Before ordering arbitration, however, the FAA and the NJUAA require the district court to make the following threshold determinations: (1) that a valid agreement to arbitrate exists, and (2) that the particular dispute falls within the scope of that agreement. *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 160 (3d Cir. 2009). Here, both parties agree that the BSA's "Mediation and Arbitration" clause is a valid arbitration agreement. (Br. in Supp. 12); (Opp'n Br. 5). Thus, the Court is left to determine only whether Plaintiff's claims fall within the scope of that clause.

In doing so, the Court is mindful of the "strong federal policy in favor of the resolution of disputes through arbitration." *Alexander v. Anthony Int'l, L.P.*, 341 F.3d 256, 263 (3d Cir. 2003); *see also Martindale v. Sandvik, Inc.*, 800 A.2d 872, 877 (N.J. 2002) (stating that New Jersey courts and legislature favor arbitration). Thus, "a court resolves doubts about the scope of an arbitration agreement in favor of arbitration." *Medtronic AVE, Inc. v. Advanced Cardiovascular Systems, Inc.*, 247 F.3d 44, 55 (3d Cir. 2001). Under this "presumption of arbitrability," an order to arbitrate "should not be denied unless it may be said with positive

assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Id*.

### C. Scope of the BSA's Mediation and Arbitration Clause

Under the BSA's "Mediation and Arbitration" clause, the parties must attempt to mediate "any disputes under this Agreement" and, should mediation fail, submit to arbitration "[a]ny controversy or claim arising out of or relating to this Agreement or the breach thereof . . . ." (Cino Aff., Ex. A, Services Agreement 6) [6-2]. Defendants argue that all of Plaintiff's claims arise out of or relate to the BSA because the claims pertain to Plaintiff's role as Medical Director—a role he would not have absent the BSA. (Br. in Supp. 13.) Plaintiff counters that the BSA provision does not manifest a clear and unambiguous commitment to arbitrate his statutory claims. Despite the strong presumption in favor of arbitration, we agree with Plaintiff that the BSA does not demonstrate the parties' intent to arbitrate Plaintiff's claims. We will therefore deny Defendants' motion.

"When deciding whether the parties agreed to arbitrate a certain matter . . . , courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). The BSA is governed by New Jersey law, (Cino Aff. Ex. A, Services Agreement 4) [6-2]. Under New Jersey law, "[i]n determining whether a particular dispute is encompassed by an arbitration provision, as in construing any other contractual provision, a court's 'goal is to discover the intention of the parties[,]' which requires consideration of the 'contractual terms, the surrounding circumstances, and the purpose of the contract.'" *Angrisani v. Fin. Tech. Ventures, L.P.*, 952 A.2d 1140, 1146 (N.J. Super. Ct. App. Div. 2008) (quoting *Marchak v. Claridge Commons, Inc.*, 633 A.2d 531, 535 (N.J. 1993)). The "proper starting point is the plain meaning of the Arbitration

Agreement. . . . Other interpretive principles need be employed only if the Agreement's plain meaning cannot be determined." *Steigerwalt v. Terminix Intern. Co., LP*, 246 F. App'x 798, 801 (3d Cir. 2007).

The terms "any disputes" and "any controversy or claim" as used in the BSA are suitably clear and would point toward the broad reading proposed by Defendants. However, these terms are qualified by the phrases "under this Agreement" and "arising out of or relating to this Agreement or the breach thereof." These qualifiers introduce ambiguity into the agreement because it is far from clear which disputes, controversies, or claims are sufficiently connected to the BSA to be considered arising out of, relating to, or under it. To be sure, courts "generally read the terms 'arising out of' or 'relating to' a contract as indicative of an 'extremely broad' agreement to arbitrate any dispute relating in any way to the contract." *Griffin v. Burlington Volkswagen, Inc.*, 988 A.2d 101, 103 (N.J. Super. Ct. App. Div. 2010). But that merely begs the question, what does it mean to "relate in any way" to the contract? Defendants want us to accept that, because Plaintiff would not be affiliated with the Hospital absent the BSA, all of his claims "arise" from the BSA. (Br. in Supp. 13.) But under that reading, there would be no limit on the claims subject to arbitration: if Plaintiff's claims of slander, civil conspiracy, and, in particular, statutory discrimination are covered, why not assault and battery, false imprisonment, or conversion if those torts would not have occurred but for Plaintiff's affiliation with the Hospital? We find that Defendants' reading would stretch the meaning of "arising out of or relating to" too far.

Other courts have taken a similar position. In *Leodori v. CIGNA Corporation*, the New Jersey Supreme Court considered whether an arbitration provision in an employment agreement covered an employee's statutory claim under the New Jersey Conscientious Employment Protection Act (CEPA), N.J.S.A. 34:19-1, *et seq.* 814 A.2d 1098, 1103 (N.J. 2003). The

9

*Leodori* Court recognized as settled law that "parties to an agreement may waive statutory remedies in favor of arbitration." *Leodori*, 814 A.2d at 1103 (quoting *Garfinkel v. Morristown Obstetrics & Gynecology Assocs.*, 773 A.2d 665, 670 (N.J. 2001)).  However, the Court, after summarizing two of its earlier decisions in the field, found as one of the "overarching tenets" that "a waiver-of-rights provision must reflect that an employee has agreed clearly and unambiguously to arbitrate the disputed claim." *Id.* at 1104.  Although *Leodori* involved an employment contract, we find that its guidance on when statutory claims fall within the scope of an arbitration agreement is equally applicable to the case at hand.  The question, then, is whether the BSA manifests a clear and unambiguous intent to arbitrate Plaintiff's claims, including his statutory remedies.  We find that it does not.

In deciding *Leodori*, the New Jersey Supreme Court relied heavily on its earlier decision in *Garfinkel v. Morristown Obstetrics & Gynecology Associates*, 773 A.2d 665 (N.J. 2001), in which the Court addressed a motion to compel arbitration of an employee's claim under the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1, *et seq.*—the same law underlying several of Plaintiff's claims.  In the key passage from *Garfinkel*, the Court offered the following guidance:

> The Court will not assume that employees intend to waive [statutory] rights unless their agreements so provide in unambiguous terms. That said, we do not suggest that a party need refer specifically to the LAD or list every imaginable statute by name to effectuate a knowing and voluntary waiver of rights. To pass muster, however, a waiver-of-rights provision should at least provide that the employee agrees to arbitrate all statutory claims arising out of the employment relationship or its termination. It should also reflect the employee's general understanding of the type of claims included in the waiver, e.g., workplace discrimination claims.

*Garfinkel*, 773 A.2d at 672.  The agreement at issue in *Garfinkel* provided for arbitration of "any controversy arising out of, or relating to, this Agreement[.]" *Id*. at 667.  The Court found this agreement insufficient to constitute a waiver of remedies under the LAD, in part because the

10

arbitration provision made no mention of statutory claims. *Id*. at 672. Instead, the provision "suggest[ed] that the parties intended to arbitrate only those disputes involving a contract term, a condition of employment, or some other element of the contract itself." *Id*. We find *Garfinkel* highly analogous to the case at hand: the language used in the arbitration agreements is nearly identical; there is no mention of any statutory claims; and the claims brought—discrimination and defamation—are comparable. Therefore, and for similar reasons as *Garfinkel*, we find that the BSA does not reflect that the parties clearly and unambiguously agreed to arbitrate Plaintiff's claims.

Defendants argue that *Garfinkel* is not persuasive on our facts.[3] They point to the Court's suggestion that, to pass muster, an arbitration clause should at least provide for arbitration of "all statutory claims arising out of the employment relationship or its termination." (Reply Br. 3 (quoting *Garfinkel*, 773 A.2d at 672).) Defendants believe the takeaway is not that arbitration agreements must include "statutory claims" but that they must reference the "employment relationship." (*Id.*) According to Defendants, that is why the New Jersey Supreme Court found in a similar case that a provision that did not list statutory rights but did subject to arbitration "all disputes *relating to my employment* with [the corporation] or termination thereof" was clear and unambiguous and sufficiently broad to encompass the plaintiff's statutory claims. *See*

---

[3] Defendants cite to a number of additional cases to bolster their argument that the BSA covers Plaintiff's claims. For example, they cite to the Supreme Court's opinion in *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105 (2001), for the proposition that employees can be forced to arbitrate statutory claims. (Br. in Supp. 8.) While Defendants are certainly correct that parties may agree to arbitrate statutory claims, they overlook that the arbitration agreement in *Adams* expressly covered "claims under federal, state, and local statutory or common law, such as the Age Discrimination in Employment Act, Title VII of the Civil Rights Act of 1964 . . . , the Americans with Disabilities Act, the law of contract and [the] law of tort." *Adams*, 532 U.S. at 110. There is no similar language in the BSA. Further, Defendants cite to a case from this district in which the court compelled an independent contractor to arbitrate a fraud claim. (Br. in Supp. 10 (citing *Capers v. Quest Capital Strategies, Inc.*, Civ. No. 06-5780, 2007 WL 2033831 (D.N.J. 2007)).) However, that agreement covered "all controversies which may arise between us, *including but not limited to* those involving any transaction or the construction, performance, or breach of this or any other agreement between us . . . ." *Capers*, 2007 WL 2033831, at *2 (emphasis added). Unlike in *Capers*, the BSA clause here is limited to claims arising from or related to the BSA itself.

11

*Martindale v. Sandvik, Inc.*, 800 A.2d 872, 883–84 (N.J. 2002) (emphasis added).  Defendants argue that the BSA could not have included such terms because Plaintiff was not an employee.  (Reply Br. 3.)  This argument is unavailing.  While we would not expect the BSA's arbitration clause to use the term "employment," it could have included some language to indicate that it covered all claims arising from the *relationship*, not merely from the *agreement*.  Thus, even under Defendants' reading of *Martindale*, the provision in the BSA was inadequate.  We therefore reject Defendants' argument and find that this case fits squarely within the reasoning of *Garfinkel*.  Accordingly, we deny the motion to dismiss.

IV. CONCLUSION

For the reasons given above, IT IS on this 13th day of April, 2011,

ORDERED that Defendants' Motion to Dismiss [docket # 6] is DENIED.

*/s/ Anne E. Thompson*
ANNE E. THOMPSON, U.S.D.J.